## Sallade, Appellant, *v.* Schuylkill County.

*Public officers—Poor law—Illegal agreement as to division of officers.*

An agreement between two out of three members of a poor board by
which the appointments to offices are divided between them, and by which
each binds himself to vote for any person that the other may name for a
position to be filled by the board, without knowing who would be named,
is illegal, immoral and contrary to public policy; but notwithstanding the
illegality of such an agreement, if a person is appointed clerk of the board
in pursuance thereof, and performs the services of the office, he will be

entitled to his salary, if it appears that he was in no way connected with the illegal contract, either as principal or accessory.

It is perfectly proper for a trial judge to rebuke the conduct of the members of a poor board in entering into an illegal contract for the division of the appointments to the offices within their control.

In an action by the clerk of a poor board to recover his salary, where it appears that the plaintiff was appointed at a regular meeting by a majority of the board, and it also appears that at the same meeting plaintiff's predecessor was dismissed, it cannot be set up as a defense to the action that the creation of the vacancy involved a breach of contract with plaintiff's predecessor in office.

Argued Dec. 5, 1901.  Appeal, No. 239, Oct. T., 1901, by plaintiff, from judgment of C. P. Schuylkill Co., July T., 1901, No. 214, on verdict for defendant in case of J. W. Sallade v. The County of Schuylkill.  Before RICE, P. J., BEAVER, ORLADY, W. W. PORTER and W. D. PORTER, JJ.  Reversed.

Assumpsit for salary as clerk of poor board.

The facts are fully stated in the opinion of the Superior Court.

The court charged in part as follows:

[Unfortunately, the management of our poorhouse, for some reason or other, judging from the reports we receive and hear in reference to it, is such as to create a stench in the nostrils of every reputable man.  Where courts and juries can properly break up the illegal sale of offices and improper conduct on the part of public officials, it is their duty to do so.] [4]

[Can two of three poor directors meet apart from the third director, without his knowledge, at a place many miles distant from the almshouse, and there agree on certain removals of employees, who have been chosen by the board at a regular meeting of the board, and at the same time agree to divide the appointments of employees between themselves, making out a list of the appointments, and then each of the directors fill in his appointments with names agreeable to himself without even consulting his codirector, who has met him in this out of the way place, as to the fitness or character of the persons thus selected, and then at a subsequent meeting of the full board proceed, in opposition to the protest of the third member of the full board, and make the removals and appointments then agreed upon, and call it an action of the board?] [5]

[In this state it has been uniformly held that municipal officers cannot bargain or barter away their rights and duties; they are to act as a deliberative body, and to that end assist each other by their united judgment, wisdom and experience, if any they have. They must meet as a board, and act as a board. In the present case, if the board of directors had met as a board and acted as a board, and made removals and appointments, although prompted by unworthy motives, yet their act being entirely under their control, no reasons could be asked for those removals, nor would it be necessary that any cause should be assigned for such removals.] [6]

[Were the removals in this case and the employment of other officers the result of the secret meetings of two directors, at places distant from the almshouse, and the result of their fraudulent bartering with each other? So far as the evidence discloses, which you must take into consideration, were not the appointments divided between the two directors who thus clandestinely met on a Sunday evening, and again met on the following Monday to bind their fraudulent and disreputable bargain, by each either directly or indirectly putting up a forfeit of a $1,000 to stand by the bargain thus made? Does not the evidence disclose that each party to this disreputable bargain filled his list of appointments before the board met in regular session? Does not the evidence show that when they met they ratified their separate lists? If this is true, what opportunity under such an arrangement had the several members of the board to exercise deliberation, consultation and judgment, as to the fitness and character of the employees thus selected? Can employees thus selected be said to have been chosen by the board? As we view the law we think not. The selection must be the selection of the board. If you find, under the evidence in this case, that the selections were made by the two members, and then hastily put through before a board meeting, which was called for the purpose of formally ratifying those selections, if they were made that way, we would say to you as a matter of law, those selections are not made according to law; in other words, that the action of the board was simply perfunctory, and might properly be designated simply a burlesque upon the discharge of its duties in such a way as the law calls upon it to discharge its duties.] [7]

194 SALLADE, Appellant, *v.* SCHUYLKILL COUNTY.

Verdict and judgment for defendant. Plaintiff appealed.

*Errors assigned* among others, were (2, 3) admission of agreement quoted in the opinion of the Superior Court; (4, 7) above instructions, quoting them.

*N. Heblich* and *C. E. Berger*, with them *M. M. Burke*, for appellant.—The motives which prompted the appointed power in making the appointments or removals may not be inquired into in a proceeding other than quo warranto: Brower v. Kantner, 190 Pa. 182; Hagner v. Heyberger, 7 W. & S. 104; Act of June 14, 1836, P. L. 621; Goldsworthy v. Boyle, 175 Pa. 246.

*A. W. Schalck*, with him *Charles A. Snyder*, county solicitor, for appellee.—The compact and agreement between the two directors of the poor is a misdemeanor at common law: Com. v. Callahan, 2 Va. Cases, 460; 1 Bishop's Criminal Law, sec. 911; Com. v. McHale, 97 Pa. 397; Gearhart v. Dixon, 1 Pa. 224; Com. v. Randolph, 146 Pa. 83; Com. v. Coyle, 160 Pa. 36.

If the compact and agreement between these two directors of the poor is a criminal misdemeanor at common law, it is of course null and void, and it must follow that nothing flowing out of such a criminal contract can be recognized by law as legitimate, or afford a cause of action to any one to reap the fruits of such a conspiracy: Bowman v. Phillips, 3 L. R. A. 631; Cobbs v. Hixson, 4 L. R. A. 682; Edwards v. Randle, 36 L. R. A. 174; Basket v. Moss, 48 L. R. A. 842; Spalding v. Ewing, 149 Pa. 375; Wilkes-Barre v. Rockafellow, 171 Pa. 177; Lancaster County v. Fulton, 128 Pa. 48; Hunter v. Nolf, 71 Pa. 282; Bowman v. Coffroth, 59 Pa. 19; Ormerod v. Dearman, 100 Pa. 561; Bowers v. Bowers, 26 Pa. 74; Filson v. Himes, 5 Pa. 452.

OPINION BY RICE, P. J., January 21, 1902:

On Sunday, April 28, 1901, Henry Becker and Edward Kester, two of the three members of the board of poor directors of Schuylkill county, entered into a written compact, which they called articles of agreement, whereby they agreed " to organize

the board of poor directors of Schuylkill county on Monday April 29, 1901, in the manner following: . . . . Edward Kester is to have the following appointments to be elected by the joint votes of Henry Becker and Edward Kester." Then followed a list of the offices parceled out to Kester and the salaries attached to each, but not naming the persons to be appointed. A similar stipulation in favor of Becker was inserted and amongst the offices placed at his disposal was that of clerk at a salary of $1,200. Then to make the compact binding for the year 1902, as well as the year 1901, the paper concluded as follows: "The positions as here divided are to be the same next year." On the following day they entered into this supplemental agreement in which two of their friends joined:

"It is further agreed that each of the parties shall hold a copy of this agreement; and it is further agreed that the sum of $1,000 dollars is to be deposited by P. W. Houck and the same sum by Wm. Goas; it being understood that P. W. Houck represents Kester, and Wm. Goas, Henry Becker; the forfeit is to bind the parties to a faithful performance of the covenants herein and before, to be forfeited by the party putting up said stake in case principal makes default. It is further agreed that a copy of this agreement be placed in an envelope and mailed to E. B. Hunter, at the Merchants' National Bank, Shenandoah, and $2,000 be deposited in the Union Safe Deposit Bank to the order of E. B. Hunter. Money or proper collateral to remain up until April 1, 1903, and not to be delivered by him until called for by Wm. Goas and P. W. Houck jointly, at the time before stated; it being however agreed that if either of the principals violate the contract so filed with E. B. Hunter, that the said E. B. Hunter shall deliver after Monday, April 29, 1901, the sum of $2,000 to the party who was ready and willing to carry out this agreement."

The money was posted as above agreed, and at the regular meeting of the board on the afternoon of the same day, all the members being present, the following resolutions were adopted by the votes of Becker and Kester against the protest of Hogan, the other member.

"Whereas, certain appointments heretofore made for the various positions at the Schuylkill County Almshouse have proved unsatisfactory to the majority of the directors of the

poor; therefore, it is resolved that all such appointees shall be dismissed and the several places so filled declared vacant.

" And it is further resolved that all vacant places be filled by other appointees, who shall assume their duties on the first day of May, 1901."

Thereupon Becker and Kester each nominated persons for the places allotted to him, and, as they constituted a majority of the board, the nominees were elected. Amongst them was the plaintiff, who was thus appointed clerk at a salary of $1,200. He entered upon the duties of his appointment on May 1, 1901, and at the end of the month received an order drawn on the county treasurer for the amount of his salary for that month. As the county controller refused to approve it, it was not paid; hence this suit.

This compact was vicious in principle, and, as properly characterized by the learned trial judge, disreputable. It is asked, " Who was injured by this agreement?" The same question might be asked with equal propriety if the offices had been sold to the highest bidder. The answer is, that the public was harmed, because it involved a surrender by each of these directors of that discretion with which the law had invested him, and which he had solemnly sworn to exercise. In whatever light it may be viewed it is odious; it presents on its face its own condemnation, even if we assume that the posting of $1,000 by each of the backers of the officers was a matter of pure and disinterested friendship. We will not waste further words to show that a compact, whereby a member of such a board, who has sworn to discharge the duties of his office, " truly, faithfully and impartially, to the best of his knowledge and ability," binds himself to vote for any person that a fellow member may name for a position to be filled by the board, without knowing who will be named, is illegal, immoral and contrary to public policy, even though he is not moved to enter into such compact by any pecuniary consideration, or the hope of pecuniary reward. This is a self-evident proposition and need not be dwelt upon.

The serious question in the case is, whether the above facts were admissible in evidence in an action by the appointee to recover his salary, his appointment being regular on its face, and he having performed the duties devolving upon him. Prima facie, this was not the case of a de facto officer suing

for the salary or fees attached to an office to which he could not show a valid title. Hence the rule that none but the officer de jure can successfully claim compensation for official service cannot be invoked to prevent recovery. We are not to be understood as holding that the title to a public office, which though regular and valid on its face, was obtained by bribery or fraud, may not be questioned in appropriate preceedings. The cases show that it may be: Commonwealth v. Walter, 83 Pa. 105; Commonwealth v. Walter, 86 Pa. 15; Leonard v. Commonwealth, 112 Pa. 607. It is urged, however, that where the title of the officer is valid and regular on its face and he is in possession, the proper and exclusive mode of attacking it upon the grounds last suggested is by quo warranto. But was the position to which the plaintiff was appointed a public office? It was not created in express terms by any of the acts to which our attention has been called. True, the act of February 23, 1859, speaks of the appointment of certain officers and amongst them, " one resident physician who shall be clerk and bookkeeper," but this was not the office to which the plaintiff was appointed. The Act of March 25, 1864, P. L. 77, authorizes the directors " to appoint a steward, and physician, and surgeon, and such other officers as may be deemed necessary by the said directors, for the proper management of the almshouse." This act did not create the office but authorized the directors to create it and prescribe the duties attached to it. But surely not every position or place created by the directors pursuant to the authority here given is a public office, and without more knowledge as to the duties attached to it than the evidence in this case furnishes, we are unable to declare that it is, in the true sense of the term, a public office. Without expressing a more decided opinion upon that question we may say this, that the mere name given to the place or position, unless public duties were attached to it, would not make it a public office. If the plaintiff was a mere employee and the relation purely contractual, we have no doubt that it would be competent to show in an action by him for his salary that he obtained the position through a fraudulent and corrupt compact to which he was a party, either as principal or accessory, and which involved a violation of official duty by the directors. Looking at the case in that view we have with great care read

and reread all the testimony for the purpose of ascertaining whether there is any evidence from which a jury could find that he was thus connected with the illegal compact of the two directors. As a result of said examination we are compelled to answer this question in the negative. The facts, that he was at the almshouse on the afternoon of the day that the appointment was made, before the meeting of the board, that he was seen in close and confidential consultation in a low tone of voice with Becker, the director to whom this appointment was allotted, that he remained until after the board met and the appointments were announced, while relevant facts, were not sufficient, without more, to warrant an inference that he was a party to the transaction, or was even cognizant of the illegal agreement that had been entered into by Becker and Kester. We are constrained to say, therefore, that it was error to submit this question to the jury, and that in the absence of sufficient evidence to connect him with the transaction, the motion to strike out the evidence referred to in the third assignment should have been sustained, and a verdict directed for the plaintiff. See Hyatt v. Johnston, 91 Pa. 196; McCarthy v. Scanlon, 176 Pa. 262; Brooks v. Penna. R. R. Co., 2 Pa. Superior Ct. 581.

It has been suggested that the appointment was illegal because the place was not vacant. In answer to this suggestion it seems sufficient to say, that if the place held by Miss Mellet, the plaintiff's predecessor, was a public office, she was removable at the pleasure of the power by which she was appointed, but if she was a mere employee and the relation purely contractual, it cannot be set up as a defense to this action that the creation of the vacancy involved a breach of the contract with her.

Much comment was made in the argument upon the remarks of the learned trial judge which are the subject of the fourth assignment of error. In the main, these remarks were unobjectionable. It was perfectly proper for the court to give a stinging rebuke to such practices on the part of public officials as were shown by the undisputed evidence in this case; but inadvertently the learned judge referred to reports concerning the management of the almshouse, which reference should have

been omitted. As the case must be reversed on other grounds this is all that need be said concerning this assignment.

We need not discuss the assignments in further detail. We have discussed the controlling questions in the case, and for the reasons given the judgment is reversed and a venire facias de novo awarded.